IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CLIFTON J. KILLINGSWORTH,     *
     *
     Plaintiff,     *
vs.     *     No. 4:15-cv-00647-SWW
     *
     *
UNION PACIFIC RAILROAD     *
COMPANY,     *
     *
     Defendant.     *

## OPINION AND ORDER

Clifton J. Killingsworth brings this action against Union Pacific Railroad Company (UPRR) alleging discrimination and retaliation in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Arkansas Civil Rights Act of 1993 (ACRA), Ark. Code Ann. § 16-123-101 *et seq*. Killingsworth alleges UPRR discriminated against him because of his race–African American–and retaliated against him for his having opposed discriminatory practices.

Before the Court is a motion of UPRR for summary judgment [doc.#8]. Killingsworth has responded in opposition to UPRR's motion and UPRR has replied to Killingsworth's response.  For the reasons that follow, the Court grants UPRR's motion for summary judgment.

## I.

Killingsworth was employed at UPRR's North Little Rock Jenks Shop.  He was hired in August 2005 and later promoted into the position of machinist.

On February 26, 2015, Killingsworth reported for his overnight machinist shift under the supervision of Lachina Jones, an African American female.  During the shift, Jones asked Killingsworth to load a basket in the Proceco machine.  Killingsworth refused this request and claimed that he did not know how to operate the machine, namely how to open its lid.  Jones did not believe Killingsworth's alleged inability to perform the task and her disagreement with him went back and forth for some time.  Killingsworth ultimately loaded the machine without incident upon learning, he states, that the lid was open.

Jones emailed a report of Killingsworth's conduct to Gerald (or Jerry) Matella, Manager of Locomotive Maintenance, and Scott Funderburg, Third Shift Foreman. Matella forwarded the email to Robyn Hiatt, then-Assistant Director of Shop Operations. In the course of her subsequent investigation of Killingsworth's conduct, Hiatt reviewed written witness statements from Jones and three additional witnesses to the disagreement. Relying on the result of this investigation, Hiatt concluded that Killingsworth had been argumentative and dishonest with Jones.  Hiatt and Don Thomas, Director of System Locomotive I, concluded that Killingsworth should be suspended and withheld from service pending the results of the formal investigation.

On March 4, 2015, Killingsworth was advised by letter that he was being withheld from service pending a formal investigation.  The letter informed Killingsworth that he was accused of violating Company Rule 1.6 Conduct Part (3): Insubordinate and Part (4): Dishonest.  This code states that "[a]ny act of hostility, misconduct, or willful disregard

or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported.  Indifference to duty, or to the performance of duty will not be tolerated."  The letter warned Killingsworth that substantiation of Jones's allegations could result in permanent dismissal and directed him to report for a formal investigation of the charges on March 17, 2015.

In lieu of proceeding to a formal hearing, UPRR decided to offer Killingsworth reinstatement subject to a Leniency Agreement.  The Leniency Agreement provided for an 18-month probationary employment period and required that, should Killingsworth engage in additional misconduct during this probationary period, his employment status would be reverted back to terminated without formal investigation.  The Leniency Agreement stated that "Mr. Killingsworth acknowledges that he understands the importance of adhering to the instructions of his supervisors in addition to providing truthful and accurate information on a daily basis."  Killingsworth confirms that he understood the Leniency Agreement as well as the consequences of any future violations if he violated the code again.  After consulting union representative Adam Lynch, Killingsworth, on March 19, 2015, decided to accept the Leniency Agreement and his employment was immediately reinstated.  Killingsworth states he "in desperation" accepted the Leniency Agreement because it would ensure that he would receive income. Killingsworth states that UPRR knew he was concerned about providing for his family and used such knowledge to influence his decision.

On July 1, 2015, Killingsworth arrived for his overnight shift around 11:00 p.m.

and attended the line-up conducted at the beginning of each shift.  Killingsworth states he

doesn't remember if his supervisor, Kenneth Halpine, announced that a "town hall"

meeting would be happening that shift (or simply didn't hear him make the

announcement) but states he nevertheless was aware that a town hall meeting was

scheduled for this shift as Halpine had mentioned it earlier in the week.  Killingsworth

states he assumed the town hall meeting, which he knew he was expected to attend,

would be the same time it always was, which he states was 5:00 a.m. or 5:30 a.m.[1]

Following line-up, Halpine directed Killingsworth to report to the load box area,

which was supervised by Robert Franke, for a work assignment.  Killingsworth arrived at

the load box area around 11:30 p.m and states he told Franke that he would be working

with him that night and that Franke replied, "Okay."  Killingsworth states he then "[s]at

down and waited" while Franke was in his office.  Killingsworth states that "[s]tandard

procedure is we all sit and wait for him to go to his office, and return with a work

assignment.  That night he did not return with a work assignment, so between the hours of

11:30 and 1:00, I knew that he had no assignment for me that night ... Franke never saw

me again, because he didn't have anything for me to do ... He made no effort, no contact,

to reach out to me for an assignment ... So the entire shift, it was known that they [sic]

was nothing for us to do."

---

[1] In his statement of material facts, Killingsworth states "[t]here was no direct evidence
that Plaintiff or other employees were ever aware that a mandatory town hall meeting was
scheduled for this shift."  This contradicts his deposition testimony in which he states, "Yes, I
did know that there was a meeting" that shift.

At 1:00 a.m., Killingsworth left the load box area for a break without telling Franke he was leaving or where he was going.  He states he then came back and, not seeing Franke, but without going to Franke's office, went to a unit–UP4009–outside of the load box "[b]ecause I was waiting on [Franke] to give me something to do." However, Killingsworth discovered that the unit was "dead," meaning essentially there was no work to be done there.  In any case, Killingsworth states he sat in the unit outside of the load box until right before 5:00 a.m. waiting for an assignment from Franke. During this time, Killingsworth never attempted to find supervisors Halpine or Franke, either to inform them of his location or the fact that he did not have a work assignment.

Killingsworth states that shortly before 5:00 a.m. he reported to the Jinx shop for the town hall meeting that he assumed was at 5:00 a.m. but that no one was there. Killingsworth states he then went to see Halpine, who told him that he missed the meeting and that it started at 4:00 a.m.  Killingsworth states he then asked Halpine if he had any work for him to do but that Halpine didn't.  Killingsworth states that from 5:00 a.m. to 7:00 a.m. he stayed in Halpine's office and then went home.  Killingsworth states he was informed by Amanda Carroll, Systems Engineer, that missing the town hall meeting was not a significant issue.

Following his absence, Halpine and Franke emailed reports of Killingsworth's conduct to Matella.  Matella forwarded these reports to Hiatt, who again investigated Killingsworth's conduct.  Upon returning for a subsequent shift, Killingsworth was told to report to Matella's office.  Killingsworth did so and, as Killingsworth and Matella waited

for union representation to arrive, Killingsworth asked Matella why he was seemingly trying to "do [him] in" and told Matella that he "felt like he had a problem with blacks." Matella did not respond.

Union representative Lynch arrived at Matella's office and Killingsworth was informed that his conduct during the July 1 shift was being investigated. Killingsworth was directed to report to Hiatt, who states she asked him to provide an oral and written statement regarding his conduct during the July 1 shift. Hiatt also states she reviewed written statements from witnesses to the alleged misconduct.

Killingsworth states his statements clearly demonstrated that he was not provided a work assignment on July 1, 2015, that he did not have knowledge of what time the town hall meeting was to be held, and that missing the town hall meeting was not a serious offense. Killingsworth further states he never evaded his superiors or avoided his work duties. Hiatt, however, states Killingsworth provided shifting explanations, first claiming that he was sent from the load box to UP4009 to work on a locomotive, then claiming he went there to wait for an electrician, and finally claiming that he simply decided to go there to wait for further instruction. Hiatt states that these statements, along with those of various witnesses and supervisors, led her to conclude that Killingsworth had intentionally evaded his supervisors, avoided performing any work, and lied to conceal his actions. Hiatt states that based on the results of the investigation, she, Thomas, Victor Trout, Director of System Locomotive III, and Toby Rees, Director of Labor Relations, agreed that Killingsworth's conduct was a direct violation of his Leniency Agreement.

Hiatt states that on July 7, 2015, with the approval of John Estes, Chief Mechanical Officer, she called Killingsworth and informed him that he was being suspended until further notice.  Hiatt states that Matella did not recommend discipline in either March or July of 2015 and that he does not have the authority to administer such discipline without her review and approval.

On July 9, 2015, Hiatt sent Killingsworth a letter notifying him that his conduct was insubordinate and dishonest and that because his conduct constituted a violation of his Leniency Agreement, his employment status was being reverted back to the status of a dismissed employee effective July 7, 2015.

## II.

UPRR argues that Killingsworth was not subjected to race discrimination or retaliation but rather was terminated only after repeatedly engaging in insubordinate and dishonest behavior.  UPRR argues that its motion for summary judgment should thus be granted and Killingsworth's claims dismissed.

## A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," or show "that the materials cited do not establish the absence or presence of a genuine dispute," or "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (citations omitted).  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and quotation marks omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita,* 475 U.S. at 587 (citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*.

B.

1.

Race discrimination claims under 42 U.S.C. § 1981, Title VII and ACRA are evaluated under the same standards.  *Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 902 (8th Cir. 2015).  To survive a motion for summary judgment on a race discrimination claim, a plaintiff must either present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).  *Macklin v. FMC Transport, Inc.*, 815 F.3d 425, 427 (8th Cir. 2016) (quotation marks and citation omitted).  Because Killingsworth has presented no direct evidence of race discrimination,[2] his claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  *Id.*  Under that framework, Killingsworth is first required to establish a prima facie case of race discrimination by showing (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently).  *Id.*  If Killingsworth establishes his prima facie case, the burden shifts to UPRR to show a nondiscriminatory reason for the adverse employment action. *Id.*  If UPRR does so, the burden shifts back to Killingsworth to establish that the proffered nondiscriminatory reason is pretextual.  *Id.*, at 427-28.  To survive summary judgment, Killingsworth must point to enough admissible evidence to raise genuine doubt as to the legitimacy of UPRR's motive.  *DePriest v. Milligan*, 823 F.3d 1179, 1186 (8th Cir. 2016) (citation and quotation marks omitted).

Killingsworth has not presented any evidence calling into question UPRR's argument that he failed to show that he was meeting UPRR's legitimate expectations and that the circumstances surrounding his termination give rise to an inference of

---

[2] Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) (quotation marks and citation omitted).

discrimination.  For example, Killingsworth does not address or otherwise acknowledge Hiatt's testimony that he provided shifting explanations concerning his alleged misconduct and that his statements did not match witness's statements and those provided by his supervisors.  Killingsworth has not established a prima facie case of race discrimination and he in any case has not shown that UPRR's legitimate, nondiscriminatory reason for his termination–that he engaged in insubordinate and dishonest behavior–is pretextual.

Killingsworth states UPRR was wrong in believing that his actions constituted insubordinate and dishonest behavior but he has offered no contrary evidence that raises genuine doubt as to the legitimacy of UPRR's motive.  "The normal rule in discrimination cases is that if an employer honestly believes that an employee is terminated for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be liable for discrimination." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) (citation omitted).  "If the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity."  *Id*.  Killingsworth's mere denial that he engaged in insubordinate and dishonest behavior is insufficient to survive summary judgment.[3]

---

[3] Killingsworth states he "will prove through testimony that similarly situated white males, in particular, Nick Smith and Alan Nations, were never reprimanded for violation of

2.

Retaliation claims under 42 U.S.C. § 1981, Title VII and ACRA are evaluated under the same standards. *Bennett v. Riceland Foods, Inc.*, No. 5:11cv00104, 2012 WL 481827, at *5 (E.D. Ark. Feb. 15, 2012). To survive a motion for summary judgment on a retaliation claim, a plaintiff may either offer direct evidence of retaliation or satisfy the *McDonnell Douglas* burden-shifting framework. *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014).[4] Having failed to produce direct evidence of retaliation, Killingsworth must first establish a prima facie case of retaliation by showing (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two. *Fiero v. CSG Systems, Inc.*, 759 F.3d 874, 880 (8th Cir. 2014) (quotation marks and citations omitted). To establish causation, Killingsworth must prove "'the desire to retaliate was the but for cause of'" the adverse employment action–that is, "'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of [UPRR].'" *Wright v. St. Vincent System*, 730 F.3d 732, 737 (8th Cir. 2013) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. —, —, 133 S.Ct. 2517, 2528, 2533 (2013)). "'It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision.'" *Blomker v. Jewell*, —

---

UPRR's policies." Even if that is true, the time for presenting such evidence was in response to UPRR's motion for summary judgment.

[4] "'Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct.'" *Id.* (citation omitted).

F.3d —, —, 2016 WL 4157594, at *6 (8ᵗʰ Cir. Aug. 5, 2016) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90-91 (2ⁿᵈ Cir. 2015)).  If Killingsworth establishes his prima facie case, UPRR must then rebut it by presenting evidence of a legitimate, non-retaliatory reason for the adverse employment action it took against Killingsworth.  *Fiero*, 759 F.3d at 880 (citation omitted).  If UPRR satisfies this burden, Killingsworth is then obliged to present evidence that (1) creates a question of fact as to whether UPRR's proffered reason was pretextual and (2) creates a reasonable inference that UPRR acted in retaliation.  *Id*.

Killingsworth essentially does not brief his retaliation claim in his response to UPRR's motion for summary judgment and he does not dispute UPRR's argument that he has failed to present evidence of a causal connection between his apparent report of alleged discriminatory treatment to which he was subjected and his termination.  See *Satcher v. University of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8ᵗʰ Cir. 2009) ("failure to oppose a basis for summary judgment constitutes a waiver of that argument").  Accordingly, Killingsworth has not established a prima facie case of retaliation and he in any case has not shown that UPRR's legitimate, non-retaliatory reason for his termination–that he engaged in insubordinate and dishonest behavior–is pretextual.

III.

For the foregoing reasons, the Court grants Union Pacific Railroad Company's motion for summary judgment [doc.#8].  The Court will enter judgment accordingly.

IT IS SO ORDERED this 4th day of October 2016.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE